UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF VERMONT

Janelle Blake,

      Plaintiff,

      v.                          Civil Action No. 2:14-cv-52-jmc

Carolyn W. Colvin, Acting Commissioner
of Social Security Administration,

      Defendant.

**OPINION AND ORDER**
(Docs. 10, 16, 19)

Plaintiff Janelle Blake brings this action pursuant to 42 U.S.C. § 405(g) of the

Social Security Act, requesting review and remand of the decision of the Commissioner

of Social Security denying her application for disability insurance benefits.  Pending

before the Court are Blake's motion to reverse the Commissioner's decision (Doc. 10),

and the Commissioner's motion to affirm the same (Doc. 16).  Also pending is Blake's

motion to remand under sentence six of 42 U.S.C. § 405(g) for consideration of new

evidence (Doc. 19), which the Commissioner opposes (Doc. 22).  For the reasons stated

below, Blake's motions are DENIED, and the Commissioner's motion to affirm the

denial of disability benefits is GRANTED.

**Background**

Blake was 40 years old on her alleged disability onset date of October 1, 2011. She completed high school, and has worked as a home attendant, a nursing assistant, and an inserter/stuffer.  She is divorced and remarried, and has two children who are approximately 18 and 23 years old.

Blake stopped working in the fall of 2011 due to constant pain in her hips and knees, and balancing problems.  (AR 32, 184.)  At the January 2013 administrative hearing, Blake testified that she suffers from bilateral hip dysplasia, degenerative disc disease of the cervical and lumbar spine, pain and numbness in the upper extremities and hands, fibromyalgia, and depression.  (AR 32–33.)  She stated that her worst pain is in the center of her lower spine and the back of her neck.  (AR 41–42.)  Blake has found that she is allergic to dyes and other artificial substances in medications, and thus takes only Tylenol and white willow bark to relieve her pain.  (AR 36, 197, 203, 312, 322–23, 326.)  On a typical day, Blake spends most of her time sitting in an electric reclining chair, getting up and moving around periodically to relieve her pain.  (AR 39–40, 50, 191.)  She states that the intensity and timing/duration of her pain is unpredictable, so it is impossible for her to plan her days in advance.  (AR 190.)  Generally, although she is able to do quick chores including vacuuming (AR 46, 191–92, 204), due to her pain, she is unable to use a computer other than for short periods; she rarely drives; and she has problems concentrating (AR 38, 42–44, 47–48, 190, 193, 204).

In October 2011, Blake filed an application for social security disability insurance benefits. (AR 69, 76–77.) Therein, she alleged that, starting on October 1, 2011, she has been unable to work due to bilateral hip dysplasia and constant pain. (AR 184.) Blake's application was denied initially and upon reconsideration, and she timely requested an administrative hearing. The hearing was conducted on January 29, 2013 by Administrative Law Judge (ALJ) Matthew Levin. (AR 27–68.) Blake appeared and testified, and was represented by an attorney. A vocational expert (VE) also testified. On February 7, 2013, the ALJ issued a decision finding that Blake was not disabled under the Social Security Act at any time from her alleged onset date through the date of the decision. (AR 10–21.) Thereafter, the Appeals Council denied Blake's request for review, rendering the ALJ's decision the final decision of the Commissioner. (AR 1–3.) Having exhausted her administrative remedies, Blake filed the Complaint in this action on March 24, 2014. (Doc. 3.)

## ALJ Decision

The Commissioner uses a five-step sequential process to evaluate disability claims. *See Butts v. Barnhart*, 388 F.3d 377, 380–81 (2d Cir. 2004). The first step requires the ALJ to determine whether the claimant is presently engaging in "substantial gainful activity." 20 C.F.R. §§ 404.1520(b), 416.920(b). If the claimant is not so engaged, step two requires the ALJ to determine whether the claimant has a "severe impairment." 20 C.F.R. §§ 404.1520(c), 416.920(c). If the ALJ finds that the claimant has a severe impairment, the third step requires the ALJ to make a determination as to whether that impairment "meets or equals" an impairment listed in 20 C.F.R. Part 404,

Subpart P, Appendix 1 ("the Listings").  20 C.F.R. §§ 404.1520(d), 416.920(d).  The claimant is presumptively disabled if his or her impairment meets or equals a listed impairment.  *Ferraris v. Heckler*, 728 F.2d 582, 584 (2d Cir. 1984).

If the claimant is not presumptively disabled, the ALJ is required to determine the claimant's residual functional capacity (RFC), which means the most the claimant can still do despite his or her mental and physical limitations based on all the relevant medical and other evidence in the record.  20 C.F.R. §§ 404.1520(e), 404.1545(a)(1), 416.920(e), 416.945(a)(1).  The fourth step requires the ALJ to consider whether the claimant's RFC precludes the performance of his or her past relevant work.  20 C.F.R. §§ 404.1520(f), 416.920(f).  Finally, at the fifth step, the ALJ determines whether the claimant can do "any other work."  20 C.F.R. §§ 404.1520(g), 416.920(g).  The claimant bears the burden of proving his or her case at steps one through four, *Butts*, 388 F.3d at 383; and at step five, there is a "limited burden shift to the Commissioner" to "show that there is work in the national economy that the claimant can do," *Poupore v. Astrue*, 566 F.3d 303, 306 (2d Cir. 2009) (clarifying that the burden shift to the Commissioner at step five is limited, and the Commissioner "need not provide additional evidence of the claimant's [RFC]").

Employing this sequential analysis, ALJ Levin first determined that Blake had not engaged in substantial gainful activity since her alleged disability onset date of October 1, 2011.  (AR 12.)  At step two, the ALJ found that Blake had the severe impairments of bilateral hip dysplasia and degenerative disc disease of the cervical and lumbar spines.  (*Id.*)  Conversely, the ALJ found that Blake's fibromyalgia, obesity, and

depression were non-severe; and that her bilateral hand pain and numbness was not a medically determinable impairment. (AR 12–13.) At step three, the ALJ found that none of Blake's impairments, alone or in combination, met or medically equaled a listed impairment. (AR 15.) Next, the ALJ determined that Blake had the RFC to perform light work, as defined in 20 C.F.R. § 404.1567(b), except that "she would need to be allowed a sit/stand option; she [could only] occasionally climb ramps or stairs, balance, stoop, kneel, crouch, or crawl; and she must avoid all climbing of ladders, ropes, or scaffold[s] and exposure to hazards." (AR 15.) Given this RFC, the ALJ found that Blake was unable to perform her past relevant work as a home attendant, a nurse assistant, or a stuffer. (AR 19.) Based on testimony from the VE, however, the ALJ determined that Blake could perform other jobs existing in significant numbers in the national economy, including representative occupations such as marker, ticket taker/seller, and toll collector. (AR 21.) The ALJ concluded that Blake had not been under a disability from her alleged onset date of October 1, 2011 through the date of the decision. (*Id.*)

## Standard of Review

The Social Security Act defines the term "disability" as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). A person will be found disabled only if it is determined that his "impairments are of such severity that he is not only unable to do his previous work[,] but

5

cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy."  42 U.S.C. § 423(d)(2)(A).

In considering a Commissioner's disability decision, the court "review[s] the administrative record *de novo* to determine whether there is substantial evidence supporting the . . . decision and whether the Commissioner applied the correct legal standard."  *Machadio v. Apfel*, 276 F.3d 103, 108 (2d Cir. 2002) (citing *Shaw v. Chater*, 221 F.3d 126, 131 (2d Cir. 2000)); *see* 42 U.S.C. § 405(g).  The court's factual review of the Commissioner's decision is thus limited to determining whether "substantial evidence" exists in the record to support such decision.  42 U.S.C. § 405(g); *Rivera v. Sullivan*, 923 F.2d 964, 967 (2d Cir. 1991); *see Alston v. Sullivan*, 904 F.2d 122, 126 (2d Cir. 1990) ("Where there is substantial evidence to support either position, the determination is one to be made by the factfinder.").  "Substantial evidence" is more than a mere scintilla; it means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.  *Richardson v. Perales*, 402 U.S. 389, 401 (1971); *Poupore*, 566 F.3d at 305.  In its deliberations, the court should bear in mind that the Social Security Act is "a remedial statute to be broadly construed and liberally applied." *Dousewicz v. Harris*, 646 F.2d 771, 773 (2d Cir. 1981).

## Analysis

Blake makes the following arguments in her motion to reverse the Commissioner's decision: (1) the ALJ erred in his analysis of Blake's ability to walk/stand, impermissibly substituting his own lay view of the medical evidence; (2) the

ALJ misclassified Blake's fibromyalgia as non-severe; (3) the ALJ should not have relied on the VE's testimony regarding work existing in significant numbers in the national economy; and (4) the ALJ failed to properly develop the record regarding Blake's depression, and failed to consider the combined effects of her depression and obesity with her other impairments.  (Doc. 10.)  Additionally, in her motion to remand under sentence six, Blake contends that her claim should be remanded because there is new and material medical evidence which "will almost certainly" alter the ALJ's decision.  (Doc. 19 at 3.)

## I.     Blake's Ability to Walk/Stand

Blake first argues that the ALJ improperly rejected the opinions of nonexamining agency consultant Dr. Louis Rosenthall regarding Blake's ability to walk/stand, and substituted his own opinion for that of the medical evidence.

In February 2012, Dr. Rosenthall reviewed Blake's medical records and opined that Blake could occasionally lift and/or carry more than 20 pounds, frequently lift and/or carry 10 pounds, stand and/or walk for a total of two hours, and sit for a total of about six hours in an eight-hour workday.  (AR 72.)  Dr. Rosenthall further opined that Blake could only occasionally climb ramps/stairs, balance, stoop, kneel, crouch, and crawl; and could never climb ladders, ropes, or scaffolds.  (*Id.*)  Dr. Rosenthall explained that Blake's functional ability was "impacted by congenital hip dysplasia aggravated by obesity." (AR 73.)  Based on these findings, Dr. Rosenthall concluded that Blake could do only sedentary work.  (AR 74.)

The ALJ stated that Dr. Rosenthall's opinions are "not afforded great weight" because they were rendered before the record included 2012 MRI results and 2013

medical evidence showing magnified pain experience.  (AR 19.)  Regarding Dr.

Rosenthall's opinion that Blake could stand/walk for only two hours, the ALJ stated that

it was "not fully supported by the evidence of record," and that the inclusion in the ALJ's

RFC determination of "an allowance to alternate positions as needed for pain" accounted

for Blake's standing/walking limitations.  (*Id.*)  The Court finds no error in the ALJ's

analysis of Dr. Rosenthall's opinions.  The ALJ's RFC determination does in fact contain

a "sit/stand option" (AR 15), which partially accounts for Dr. Rosenthall's opinion that

Blake could stand/walk for only two hours.  Moreover, there is substantial medical

evidence, much of it post-dating Dr. Rosenthall's opinions, which discredits these

opinions.  This evidence includes normal and mild examination findings (*see, e.g.*, AR

309, 321, 323), and treatment notes indicating that: x-rays of Blake's spine were "within

normal limits" and x-rays of her hips showed "nothing that would correlate with her . . .

symptoms" (AR 309); Blake's complaints of pain were out of proportion to the

maneuvers performed on examination (AR 344); Blake had a magnified pain experience

with psychosocial overlay (AR 345); Blake refused to take medication recommended by

her treating provider (AR 312, 323); and white willow bark "dramatically improved"

Blake's pain by 80% (AR 322).  (*See also, e.g.*, AR 305–10, 313, 321.)

     Blake argues that the ALJ's RFC determination was based on the ALJ's own lay

analysis of the medical evidence rather than on the medical evidence itself, pointing out

that no physician opined that Blake could manage more than two hours per day of

walking/standing.  It is true that ALJs cannot arbitrarily substitute their own judgment for

competent medical opinion.  *See Balsamo v. Chater*, 142 F.3d 75, 81 (2d Cir. 1998)

("[W]hile an [ALJ] is free to resolve issues of credibility as to lay testimony or to choose between properly submitted medical opinions, he is not free to set his own expertise against that of a physician who [submitted an opinion to or] testified before him.") (alterations in original) (internal quotation marks omitted).  But that is not what the ALJ did here: as discussed below, the ALJ's decision—which is supported by substantial medical evidence—demonstrates that the RFC determination was not based on the ALJ's own speculation or judgment, but rather on medical evidence.

The ALJ gave "significant weight" (AR 18, 19) to the opinions of Blake's treating orthopedic surgeon, Dr. Elizabeth McLarney, who recommended that Blake strive to do one hour of aerobic activity, such as swimming, walking, or stationary biking, each day (AR 287).  The ALJ explained that Dr. McLarney is a treating specialist; her opinion is "reasonable in light of [her] examination [of Blake]"; and "her general conclusion is not inconsistent with [a] light [RFC]."  (AR 19.)  The record supports these findings.  In a January 2012 treatment note, Dr. McLarney recommended that Blake "be as active as possible," and "place[d] no restrictions on her activity level."  (AR 288.)  These statements, made by a treating specialist, are inconsistent with the opinion of Dr. Rosenthall, a nonexamining consultant, that Blake could stand/walk for only two hours. And Dr. McLarney's opinions are consistent with those of other treating providers, including Dr. Nancy Johnson, who stated in a January 2013 treatment note that she discussed the benefits of exercise with Blake "and specifically discussed aerobic exercise with a goal of 30 minutes daily."  (AR 345.)  Similarly, treating physician Dr. Alexandra

Van Dyck stated in a November 2012 treatment note that she discussed exercise with Blake. (AR 312.) Dr. Van Dyck also stated that Blake "knows that there are medications that we could consider starting such as Cymbalta, . . . [h]owever, she doesn't wish to do this." (*Id.*) Also supportive of Dr. McLarney's opinion that Blake was unrestricted in her ability to engage in physical activities, in an October 2011 treatment note, Physician's Assistant (PA) Anika Opp-Harris stated that Blake could "resume work [without] restrictions." (AR 301.) The "work" Blake had been doing prior to that date was as a certified nursing assistant, a job requiring medium exertion. (AR 59.) Therefore, treating PA Opp-Harris believed Blake could do a job requiring significant lifting, walking, and standing during the alleged disability period, in contrast to Dr. Rosenthall's belief that Blake could not even stand/walk for two hours.

The Court finds that the ALJ properly chose among competing opinions to determine Blake's RFC, and did not substitute his own lay opinion. *See Balsamo*, 142 F.3d at 81. The ALJ's decision not to adopt Dr. Rosenthall's opinion that Blake could stand/walk for only two hours is supported by the opinions of multiple treating providers, who collectively believed that Blake could work and exercise without restriction. The ALJ gave good reasons for affording more weight to the opinions of treating physician Dr. McLarney than to those of agency consultant Dr. Rosenthall.[1] Notably, Dr.

---

[1] The ALJ's decision states that he afforded "significant weight" to Dr. McLarney's opinions (AR 18, 19) and "substantial weight" to Dr. Rosenthall's opinions (AR 19). As Blake points out, these terms have essentially the same meaning; but confusingly, the ALJ afforded more weight to the opinions of Dr. McLarney than to those of Dr. Rosenthall. There is no error, however, as it is clear from the ALJ's decision, including his RFC determination, what weight he afforded to each opinion and why. (See above discussion.)

McLarney's opinions are consistent with those of other treating providers, including Dr.

Van Dyck, Dr. Johnson, and PA Opp-Harris.  And the ALJ accurately stated that "no

treating source of record supports a finding of disability."  (AR 19.)  Also noteworthy

(although not discussed in the ALJ's decision), as an agency consultant, Dr. Rosenthall

did not examine Blake, in contrast to Dr. McLarney and the other providers mentioned

above, whose treatment of Blake included examinations.  While the findings of

nonexamining analysts can provide valuable supplemental support for an ALJ's decision,

they should generally be afforded relatively little weight in the overall disability

determination.  *See Vargas v. Sullivan*, 898 F.2d 293, 295 (2d Cir. 1990); 20 C.F.R. §

404.1527(c)(1).

## II.    Blake's Fibromyalgia

Blake argues—for the first time in her reply brief—that the ALJ neglected to

consider that Dr. McLarney treated only Blake's hip pain and not her other impairments

including her fibromyalgia, which Blake claims the ALJ "misclassified . . . as non-

severe."  (Doc. 18 at 1.)  Generally, arguments like this which are raised for the first time

in a reply brief are deemed waived.  *Connecticut Bar Ass'n v. United States*, 620 F.3d 81,

91 n.13 (2d Cir. 2010).  While this waiver, by itself, is reason enough to reject Blake's

belated fibromyalgia claim, she fails in any event to demonstrate error.  The ALJ was

aware of the fact that Dr. McLarney primarily treated Blake's hip pain, given the

statement in his decision that Dr. McLarney was Blake's "treating orthopedic surgeon."

(AR 18.)  Moreover, Dr. Rosenthall, who did not treat Blake at all, also did not consider

Blake's fibromyalgia, presumably because the record did not demonstrate that the

impairment was significantly limiting during the relevant period and because Blake did

not include fibromyalgia as a reason for being unable to work in her disability

application.  (*See* AR 69 (indicating that Blake's application was filed due to her bilateral

hip dysplasia and constant pain); AR 71 (listing Dysfunction of the Major Joints and

Obesity as Blake's diagnoses).)

Blake also argues for the first time in her reply brief that the ALJ's discussion of

her fibromyalgia was "inadequate."  (Doc. 18 at 5.)  Again, Blake waived this issue by

not raising it in her moving brief.  *Connecticut Bar Ass'n*, 620 F.3d at 91 n.13.  The Court

has, however, considered it and finds that it lacks merit, given that substantial evidence

supports the ALJ's finding that Blake's fibromyalgia was "non-severe."  (AR 12.)  The

ALJ explained that, although subjectively, Blake "endorse[d] ongoing pain, tingling, and

burning in her whole body," a fibromyalgia diagnosis "is not clearly supported by the

evidence of record, as [Blake] reports good relief with natural white willow bark, and as

her symptom magnification calls into question her credibility as a general matter."  (AR

12–13.)  Blake cites to the treatment notes of Dr. Johnson, Dr. Van Dyck, and PA Linda

Groiss in support of the claim that her fibromyalgia was a severe impairment, but none of

these providers made an opinion about the severity of Blake's fibromyalgia.  Rather, on

June 19, 2012, well into the alleged disability period, PA Groiss questioned the diagnosis,

writing under the "Assessment" part of her treatment note: "generalized body pain ?

fibromyalgia."  (AR 309.)  About a week later, Groiss stated in another treatment note:

"[Blake] questions today if I think she has fibromyalgia, and I advised that I do think she

does, but that I generally do not give this out as a diagnosis and would have her discuss

this with her primary care physician and see what her feelings are on that also." (AR 305.)

Although by November 2012, Dr. Van Dyck had assessed Blake as having fibromyalgia (AR 312), the Doctor stated a few months earlier in July 2012 that a tender point examination was "not diagnostic" (AR 323). Dr. Van Dyck further stated that she believed Blake "might benefit from a drug like Cymbalta, nortriptyline, or cyclobenzaprine," but the Doctor was unable to prescribe any of these for Blake because "she is not comfortable with taking medications." (*Id.*) In a January 2013 treatment note, although Dr. Johnson assessed that Blake had chronic widespread pain consistent with fibromyalgia, she did not identify any tender points other than "a great deal of tenderness to palpation about the low back and hip girdle, and the posterior cervical region." (AR 344.) Dr. Johnson stated that Blake's complaints were "out of proportion to maneuvers," noting as an example that Blake "winced and jumped back, crying out that her back hurt" before the Doctor applied any pressure to her leg. (*Id.*) Dr. Johnson further stated that Blake had a "magnified pain experience with psycho-social overlay," using "extreme descriptive phrasing in talking about her pain." (AR 345.) Given that Blake "did not feel she could take any medications," Dr. Johnson recommended exercise and Tai Chi, and consulting with a psychologist to explore a cognitive behavioral approach to managing her pain. (*Id.*)

This medical evidence, considered by the ALJ in his decision (AR 12–13), constitutes substantial evidence supporting the ALJ's decision that Blake's fibromyalgia was not severe.

### III.   Work Existing in Significant Numbers in the National Economy

Next, Blake asserts that the ALJ erred in his step-five finding that there are jobs existing in significant numbers in the national economy that Blake can perform. According to Blake, the ALJ should not have accepted the VE's testimony on this issue, because the VE used SkillTRAN Job Browser Pro, a commercial software program analyzing jobs data, to formulate his opinions, and the numbers provided by that program were "demonstrably incorrect," making the VE's testimony unreliable.  (Doc. 10 at 6, 7.) Blake explains that, according to the VE, Job Browser Pro identified 100 toll collector positions in Vermont (AR 60, 62), but in fact, there are no toll roads in the state and thus no toll collectors and no toll collector jobs.  (Doc. 10 at 7; Doc. 10-1.)

The parties dispute whether there are any toll roads, public or private, in Vermont, and thus whether there are any toll collector jobs in the state.[2]  The Court need not delve into this factual debate, however, because the ALJ was entitled to rely on the national job numbers and was not required to find that jobs existed in Vermont.  *See* 20 C.F.R. § 404.1566(b) ("If work that [the claimant] can do does not exist in the national economy, we will determine that you are disabled.  However, if work that you can do does exist in the national economy, we will determine that you are not disabled.").

There is no requirement in the regulations that ALJs find that work exists in the particular state where the claimant lives.  Rather, the regulations provide that "work

---

[2]  To demonstrate that there are no toll collector jobs in Vermont, Blake submits a letter from Assistant Attorney General John Dunleavy which states that, as of March 27, 2013, there were no public toll roads or toll collectors in the state.  (Doc. 10 at 7; Doc. 10-1.)  The Court does not consider this letter, as Blake has not established that there was "good cause for her failure to present [it] earlier."  *Jones v. Sullivan*, 949 F.2d 57, 60 (2d Cir. 1991.)

exists in the national economy when it exists in significant numbers either in the region

where [the claimant] live[s] or in several other regions of the country," and that, "[i]t

does not matter whether . . . [w]ork exists in the immediate area in which [the claimant]

live[s]." 20 C.F.R. § 404.1566(a).  The Social Security Administration explained that the

purpose of defining the phrase "work which exists in the national economy" in this way

is "not only to make it clear that jobs need not be available in the region in which the

individuals live, but also to emphasize that, conversely, a type(s) of job which exists only

in very limited numbers or in relatively few geographic locations may not be said to

'exist in the national economy.'"  SSR 82–53, 1982 WL 31374, at *3 (1982).  The

Administration further explained that this distinction "assure[s] that individuals are not

awarded benefits simply on the basis of lack of jobs in the region in which they live, nor

denied benefits on the basis of the presence in the economy of isolated jobs in which the

individuals could engage."  *Id.*  Applying the relevant regulation, the Northern District of

New York explained that "the unavailability of work in the claimant's local area . . .

*do[es] not* constitute grounds for a disability finding."  *Colon v. Comm'r of Soc. Sec.*, No.

6:00CV0556 (GLS), 2004 WL 1144059, at *8 (N.D.N.Y. Mar. 22, 2004).  The court

continued: "Although [the claimant] argues that th[e relevant] jobs are unavailable in the

regional economy, the truth of that assertion is irrelevant because it fails to consider the

proper legal standard."  *Id.*  Thus, even assuming there are no toll collector jobs in

Vermont, Blake has not shown error, given that the VE identified 43,000 toll collector

jobs nationally.  (AR 60.)  *See Colon*, 2004 WL 1144059, at *8 (because ALJ properly

relied on VE testimony that 100,000 jobs existed in national economy, claimant's contention that jobs were unavailable in his region was irrelevant).

In any event, assuming the ALJ erred regarding the toll collector job, the error is harmless because the VE testified to two other jobs existing in significant numbers in the national economy that Blake could perform—marker and ticket seller—and Blake has not demonstrated any error regarding the ALJ's adoption of that testimony.  (*See* AR 21, 60.)  The regulations require that a significant number of jobs exist in only "one or more occupations."  20 C.F.R. § 404.1566(b).  Therefore, even if Blake was able to do only one of the three jobs which the ALJ determined existed in significant numbers in the national economy, a finding of not disabled would be appropriate.  *See Martin v. Comm'r of Soc. Sec.*, No. 5:06-CV-720 (GLS/DEP), 2008 WL 4793717, at *12 (N.D.N.Y. Oct. 30, 2008) ("[E]ven the finding that one job exists in sufficient numbers in the national economy capable of being performed by the plaintiff is sufficient to sustain the Commissioner's burden at step five." (citing 42 U.S.C. §§ 423(d)(1), (A)(d)(2)(A), 1382c(a)(3)(A), (B))).  The VE testified that there were significant numbers of the marker and ticket seller jobs both nationally and regionally.  (AR 21, 60.)

Blake argues that, in addition to the VE's improper reliance on Job Browser Pro to determine the number of jobs available, there was insufficient basis for the VE's reduction of those numbers by 20% to accommodate the sit/stand option included in the ALJ's RFC determination.  (Doc. 10 at 8.)  Contrary to Blake's claim, however, the VE did not rely exclusively on Job Browser Pro to determine the number of jobs Blake could

perform.  Rather, the VE also used his experience and expertise,[3] testifying that he

"didn't take the whole number [of jobs] from [Job Browser Pro]" but rather approximated

percentages based on the Job Browser Pro numbers and then multiplied that number by

one million.  (AR 66.)  The VE further testified that his 20% reduction of the job

numbers was his "best guess" and his "opinion" based on his experience.[4]  (AR 60.)  The

record, specifically the VE's resume, reveals that the VE has ample experience in

vocational assessment and career counseling.  (AR 125.)  The VE further testified about

techniques he used for corroborating the numbers provided by Job Browser Pro,

including speaking with a supervisor at a shoe store, determining how the store's shoes

were supplied, and applying that information to other companies that produce and

distribute shoes.  (AR 64–65.)

In *Brault v. Social Security Administration*, the Second Circuit held that, although

a VE's testimony cannot constitute "substantial evidence" if it is "conjured out of whole

cloth"; "[n]othing more was required" where: (a) the ALJ asked the VE to affirm that he

would impartially evaluate the vocational evidence, and that, in the event of conflict

between his testimony and the DOT, he would advise the ALJ of the differences and the

basis for his opinion; (b) the ALJ identified a specific issue in the claimant's case where

---

[3] Blake's attorney stated at the administrative hearing that he did not have any objection to the VE's qualifications.  (AR 59.)

[4] Although the VE did not fully explain his 20% reduction methodology at the administrative hearing (*see* AR 60–61), Blake does not present persuasive argument that it was "wholly arbitrary," and it appears to provide "a fair estimate of the jobs available in the national economy"; thus, the Court finds that it may be relied upon.  *See Jones-Reid v. Astrue*, 934 F.Supp.2d 381, 407 n.13 (D. Conn. 2012) ("The VE's 25 to 50 percent reduction methodology is not fully explained by the VE . . .[, but] [a]s long as this methodology is not wholly arbitrary and provides a fair estimate of the jobs available in the national economy then it may be relied upon."), *aff'd*, 515 F. App'x 32 (2d Cir. 2013).

such a conflict might arise; (c) the ALJ sought and received a stipulation from the claimant's counsel regarding the VE's expertise and qualifications; and (d) the claimant's attorney was given a full opportunity to explore the limitations of the VE's methodology on cross-examination. 683 F.3d 443, 450–51 (2d Cir. 2012) (internal quotation marks omitted). Here, the record demonstrates that the VE's reduction in the number of jobs Blake could perform was not conjured out of whole cloth, and the ALJ ensured that each of the above factors was met. (*See, e.g.*, AR 58–59, 61–67.) As reflected in the hearing transcript, the ALJ provided Blake's attorney with a full opportunity to explore the limitations of the VE's methodology in determining the percentage of reduction of jobs given Blake's sit/stand limitation, and even considered Blake's post-hearing motion to strike the VE's testimony. (*See* AR 61–67, 214.)

In *Vandermark v. Colvin*, the Northern District of New York recently surveyed court decisions in this circuit addressing the issue of how to assess VE testimony regarding job incidence, and concluded as follows:

> *Courts generally accept as substantial evidence imprecise vocational expert opinions formed consistent with the methodology utilized by their professional contemporaries and based upon sources, materials[,] and data generally deemed reliable.* "Experience" may provide the necessary foundation for vocational experts' testimony, especially when the record reflects that they personally performed actual market surveys or placed substantial numbers of clients within the jobs they identified as matching claimants' residual functional capacities. Courts balk, however, when vocational experts provide incidence testimony based on broad occupation groupings without accounting for the fact that such groupings include more jobs tha[n] a particular claimant can perform, without adjusting those incidence numbers accordingly or when they otherwise inject meaningful uncertainty as to how adjustments are made.

Civil Action No. 3:13–cv–1467 (GLS/ESH), 2015 WL 1097391, at *16 (N.D.N.Y. Mar.

11, 2015) (emphasis added).[5]  As discussed above, the VE had extensive experience in

the field of vocational assessment.  The VE's opinion regarding the incidence of jobs that

Blake could do was formed in reliance on the standard statistical publication Job Browser

Pro, and corroborated by the VE's own vocational research.  The VE identified the source

on which he relied in determining the job numbers, and submitted to full cross-

examination regarding this source at the administrative hearing.  Relying on his

experience and expertise, the ALJ then reduced the number of jobs by 20% due to the

sit/stand option included in the ALJ's hypothetical question.  This methodology meets the

requirements under applicable case law for providing a foundation for VE testimony

rising to the level of substantial evidence.  *See id.* at *17 ("While [the VE's] adjustments

[to the job numbers] were not made through application of formal theory or use of

mechanical or technological aids, [the] VE['s] panoptic experience permitted him to form

---

[5]  The district court in *Vandermark* also discussed the reliability of the Job Browser Pro program generally, stating as follows:

> According to the SkillTRAN website, "Job Browser Pro" is a software tool for "VE and Forensic Testimony" containing "an enormous amount of occupational and labor market information."  It "features a . . . continuously peer-reviewed methodology to estimate DOT employment numbers using standard government data."  *See* Job Browser Pro Version 1.6 by SkillTRAN, available at http://www.skilltran.com/jb_overview.htm (last visited on Jan. 6, 2015).  In *Malone v. Astrue*, No. 3:10–cv–01137, 2011 WL 5879436, at *3 (M.D. Tenn. Nov. 23, 2011)[,] SkillTRAN was described as having a methodology for reducing Occupational Employment Statistics ("OES") numbers based on frequency of DOT codes underneath the OES numbers by how they typically exist in the population using census numbers.  *Id.*

*Vandermark*, 2015 WL 1097391, at *10 n.22; *see Wright v. Colvin*, No. CV 12–1893–SP, 2014 WL 5456044, at *5 (C.D. Cal., Oct. 27, 2014) (citing http://www.skilltran.com/jb_overview.htm) ("[Job Browser Pro] is a private software program that cross references the [Dictionary of Occupational Titles] and Occupational Outlook Handbook with the other major coding systems, including [Occupational Employment Statistics].").

a reliable opinion based on judgment, instinct and effort."); *Poisson v. Astrue*, No. 2:11–cv–245–NT, 2012 WL 1067661, at *9 (D. Me. Mar. 28, 2012) (VE testimony regarding job numbers found sufficiently reliable to support step-five finding, where VE relied on Job Browser Pro but could not explain "in precise technical detail" how that system worked, because VE also relied on "her professional experience and expertise" in endorsing the numbers provided to the ALJ); *cf. Dorman v. Soc. Sec. Admin.*, Civil Action No. 12–40023–TSH, 2013 WL 4238315, at *10 (D. Mass. May 21, 2013) (VE testimony regarding job numbers found not sufficiently reliable because VE "specifically confirmed that he relied exclusively on [Job Browser Pro's] computer software, and not on any other experience" and "rendered no opinion as to the accuracy of those numbers and did not otherwise endorse the information provided by . . . Job Browser Pro software").

For these reasons, the Court rejects Blake's argument that the Commissioner did not meet her limited step-five burden to prove that there are jobs existing in significant numbers in the national economy that Blake can perform.

## IV.    Blake's Depression and Obesity

### A.    Development of Record Regarding Blake's Depression

Next, Blake argues that the ALJ did not properly develop the record regarding her depression.  There is no merit to this argument, as Blake has failed to demonstrate that there is evidence indicating that her depression had a significant effect on her ability to function during the relevant period.  Although ALJs have a general duty to develop the record, "where there are no obvious gaps . . ., and where the ALJ already possesses a

complete medical history, the ALJ is under no obligation to seek additional information in advance of rejecting a benefits claim." *Rosa v. Callahan*, 168 F.3d 72, 79 n.5 (2d Cir. 1999) (internal quotation marks omitted). Here, the ALJ properly determined that he could render a decision regarding Blake's depression based on the record before him.

As stated in the ALJ's decision, Blake refused the suggestion of at least one medical provider that she take prescribed medication for her depression, and this refusal was not because the medication contained dyes (it did not). (AR 13.) Indeed, in a July 2012 treatment note, Dr. Van Dyck stated that, "after doing internet research," Blake decided not to take paroxetine for her depression, even though the medication contained no dyes, as "she was still averse to taking it." (AR 322.) Dr. Van Dyck further stated that Blake was taking white willow bark, which resolved 80% of her muscle pains and resulted in her "functioning much better." (*Id.*) The Doctor added that Blake felt strongly that her depression was caused by her pain, and without the pain, she would not be depressed. (*Id.*) At the January 2013 administrative hearing, Blake testified that she was not taking any medication for depression because, "you know, you feel better one day and kind of okay." (AR 39.) The ALJ properly considered Blake's failure to take medication for her depression in assessing the severity of that condition. *See* 20 C.F.R. § 404.1530(b) ("If you do not follow the prescribed treatment without a good reason, we will not find you disabled."); SSR 96-7p, 1996 WL 374186, at *7 (July 2, 1996) (A claimant's statements "may be less credible if the level or frequency of treatment is inconsistent with the level of complaints, or if the medical reports or records show that

the individual is not following the treatment as prescribed and there are no good reasons for this failure.").

The ALJ also noted that Blake had not engaged in any mental health treatment and did not include depression as an impairment in her initial disability application or other disability forms. (AR 13.) Indeed, Blake testified at the administrative hearing that she had not engaged in any kind of regular counseling or treatment for her depression. (AR 39.) Moreover, she did not indicate that depression or any other mental impairment limited her ability to work either in her initial disability application (*see* AR 184) or in an updated form related to that application (*see* AR 200). Citing to Blake's testimony at the January 2013 administrative hearing (AR 13–14), the ALJ accurately noted that Blake did not begin experiencing "really bad" depression until "probably" a few months earlier, i.e., the fall of 2012 (AR 38), well into the alleged disability period.[6] The ALJ concluded as follows: "Given [Blake's] lack of mental health treatment, medicinal management, or consistent reported symptoms in other treatment, I find [Blake's] alleged depression non-severe." (AR 14.) Substantial evidence supports this finding, and Blake presents no evidence or convincing argument to the contrary. In fact, the only evidence of Blake's depression are either her own subjective statements or those of her medical providers based on her own statements (*see, e.g.*, AR 38, 308, 311, 320, 324), but even many of Blake's own statements do not reflect that her depression was significantly limiting. For example, when asked about her depression symptoms at the administrative hearing, Blake

---

[6] Also noteworthy, Blake testified that her depression was "minor" until "probably the last couple [of] months" before the January 2013 administrative hearing. (AR 38.)

stated that she felt like she had "lost" herself and she was "tired of being in pain." (AR

38.) The Commissioner correctly points out that these are not symptoms from which the

ALJ could infer a significant impact on Blake's ability to function. (Doc. 16 at 21.)

### B.   Combined Effects of Depression, Obesity, and Other Conditions

Blake also argues that the ALJ failed to consider the combined effects of her

depression and obesity with her other impairments. The argument fails for two principal

reasons: first, Blake has not pointed to any particular limitations on her ability to work

that allegedly were caused by a combination of Blake's depression and obesity which the

ALJ did not address or addressed in an inappropriate manner in his decision; and second,

the ALJ adequately addressed Blake's depression and obesity in his decision.

The regulations require that, at step two of the five-step sequential process, the

ALJ must consider "the combined effect of all of [the claimant's] impairments without

regard to whether any such impairment, if considered separately, would be of sufficient

severity" to be the basis for disability benefits eligibility. 20 C.F.R. § 404.1523. The

regulations further require that, in assessing a claimant's RFC, the ALJ must "consider all

of [the claimant's] medically determinable impairments of which [they] are aware,

including [the claimant's] medically determinable impairments that are not 'severe' . . . ."

20 C.F.R. § 404.1545(a)(2). Here, the ALJ specifically acknowledged Blake's various

ailments—including her depression and obesity—at step two. (AR 12–14.) The ALJ

found that Blake's obesity was non-severe because "[t]here is insufficient medical

evidence of record to establish that [Blake's] weight results in any functional

limitations." (AR 13.) Blake presents no evidence to the contrary. Nonetheless, the ALJ

stated in his decision that "any residual deficits stemming from [Blake's] obesity are well-accounted for in the [RFC]."  (*Id.*)  Regarding Blake's depression, as discussed in detail above, the ALJ found that it was non-severe because it "does not cause more than minimal limitation in [Blake's] ability to perform basic mental work activities."  (AR 14.)  The ALJ further found, at step three, that Blake's depression was accounted for in his RFC determination, stating as follows: "the following [RFC] assessment reflects the degree of limitation I have found in the 'paragraph B' mental function analysis."  (AR 15.)

Where, as here, the ALJ's decision identifies each of the claimant's impairments, the decision is "not vulnerable to . . . reversal" on grounds that the ALJ failed to consider all of the claimed impairments in combination.  *Tinsley v. Barnhart*, Civil No. 3:01CV977(DJS)(TPS), 2005 WL 1413233, at *6 (D. Conn. June 16, 2005); *see Forrest v. Astrue*, Civil Action No. 2:10–CV–20, 2011 WL 759401, at *11-12 (D. Vt. Feb. 24, 2011).  The ALJ's decision demonstrates that he considered all of Blake's impairments, as well as the functional limitations caused by the combination thereof, in assessing Blake's RFC.  Thus, the ALJ's alleged failure to explicitly consider Blake's depression and obesity in combination with her other impairments is not grounds for remand.

## V.    Sentence Six Motion to Remand for New Evidence

Finally, Blake asserts in her motion to remand under sentence six that there is new medical evidence establishing that Blake has the additional diagnosis of probable multiple sclerosis which meets a listing and imposes severe functional limitations.  (Doc. 19.)  Blake submits two documents, both prepared by Dr. Frank Graf on October 21,

2014, in support of her motion to remand for new evidence: (1) a report detailing Blake's

medical history and the results of Dr. Graf's examination of Blake (Doc. 19-1); and (2) a

Medical Source Statement (MSS) detailing Blake's functional limitations (Doc. 19-2).  In

the report, Dr. Graf concludes that Blake "meets the criteria of Listing 11.09 [for]

multiple sclerosis with disorganized motor function effecting cranial nerves and the lower

extremities"; and that "[c]ervical and lumbosacral conditions and bilateral hip dysplasia

further contribute to limitations in functional activities and work capacity limitations such

that [Blake] is totally disabled."  (Doc. 19-1 at 8.)  In the MSS, Dr. Graf notes that,

among other limitations, Blake can lift only less than ten pounds, can stand/walk for less

than two hours and sit for less than six hours in an eight-hour workday, and is limited in

her ability to push and pull with her upper and lower extremities.  (Doc. 19-2 at 1–2.)

 A court may remand a case to the Commissioner to consider additional evidence,

but only upon a showing that "'there is new evidence which is material and that there is

good cause for the failure to incorporate such evidence into the record in a prior

proceeding.'"  *Jones v. Sullivan*, 949 F.2d 57, 60 (2d Cir. 1991) (quoting 42 U.S.C. §

405(g)).  This court has used the following three-pronged approach in determining

whether to remand for consideration of additional evidence:

> [A]n appellant must show that the proffered evidence is (1) new and not
> merely cumulative of what is already in the record, and that it is (2)
> material, that is, both *relevant to the claimant's condition during the time*
> *period for which benefits were denied* and probative.  The concept of
> materiality requires, in addition, a reasonable possibility that the new
> evidence would have influenced the [Commissioner] to decide claimant's
> application differently.  Finally, claimant must show (3) good cause for her
> failure to present the evidence earlier.

*Jones*, 949 F.2d at 60 (first alteration in original) (emphasis added) (citations and internal

quotation marks omitted); *see Tirado v. Bowen*, 842 F.2d 595, 597 (2d Cir. 1988).

Implicit in this approach is the recognition that "claimants ordinarily should have but one

opportunity to prove entitlement to benefits[;] otherwise disability administrative

proceedings would be an unending merry-go-round with no finality to administrative and

judicial determinations." *Tirado*, 842 F.2d at 596.

 The new evidence submitted by Blake is not material, as it does not relate to the

period under review. *See Vitale v. Apfel*, 49 F. Supp. 2d 137, 142 (E.D.N.Y. 1999)

(citing *Jones*, 949 F.2d at 59–60) (a retrospective opinion may be used to support the

existence of a disability only when that opinion clearly refers to the disability period and

not when the opinion "simply express[es] an opinion as to the claimant's current status");

*Pollard v. Halter*, 377 F.3d 183, 193 (2d Cir. 2004) (to be "material," evidence must be

"relevant to the claimant's condition during the time period for which benefits were

denied") (internal quotation marks omitted).  As noted above, Dr. Graf's examination and

functional assessment of Blake occurred in October 2014 (Doc. 19-1 at 7–8; Doc. 19-2 at

4), approximately 20 months after the ALJ's February 2013 decision which closed the

period under review (AR 21).  *See* 20 C.F.R. § 404.620(a) (stating that a claimant's

disability application remains in effect only until the ALJ's decision is issued).  Dr. Graf

uses the present tense when making his relevant opinions, stating for example that Blake

"*meets* the criteria of Listing 11.09" and "*is* totally disabled."  (Doc. 19-1 at 8 (emphases

added).)  Dr. Graf makes no attempt to connect his opinions about Blake's functional

limitations to the relevant period–before the ALJ's February 2013 decision.

Moreover, the examination findings of Dr. Graf are inconsistent with those of the physicians who examined Blake during the relevant period.  Specifically, for Dr. Graf to have concluded, as he did, that Blake met the criteria of Listing 11.09 (Doc. 19-1 at 8), he must have found that she had a sustained disturbance of gross and dexterous movements or gait and station which significantly interfered with Blake's locomotion and/or use of fingers, hands, and arms.  *See* 20 C.F.R. pt. 404, supt. P, app. 1, §§ 11.00C, 11.04B, 11.09A.  But the treatment notes of medical providers examining Blake during the relevant period do not indicate that Blake struggled with such severe limitations in her ability to walk and move.  (*See, e.g.*, AR 287, 344–45.)  For example, although Dr. McLarney observed in January 2012 that Blake ambulated with "an overpronation deformity bilaterally" and that her range of motion was "somewhat cogwheeling and hesitant throughout the range of motion of her hip actively" (AR 287), the Doctor recommended that Blake "be as active as possible" and stated that Blake required "no restrictions on her activity level" (AR 288), clearly indicating her belief that Blake was not severely limited in her ability to walk and move.  As discussed above, other treating medical providers made similar recommendations.  Therefore, even assuming the veracity of Dr. Graf's findings on the date they were made (October 21, 2014), the record demonstrates that this is not a case of a retrospective diagnosis of a condition that was disabling during the relevant period, but rather, a case of a non-disabling condition that subsequently deteriorated after the relevant period.  *See Pearson v. Astrue*, No. 1:10-CV-00521 (MAD), 2012 WL 527675, at *11 (N.D.N.Y. Feb. 17, 2012) ("Materiality requires that the new evidence not concern a later-acquired disability or the subsequent

27

deterioration of the previous non-disabling condition.") (internal quotation marks omitted); *cf. Lisa v. Sec'y of Health & Human Servs.*, 940 F.2d 40, 44 (2d Cir. 1991) (introduction of new diagnostic evidence presented a "reasonable possibility" of influencing the Commissioner to decide claimant's application differently, where the evidence suggested that claimant had an impairment "substantially more severe than was previously diagnosed").

For these reasons, Blake has failed to demonstrate that the new evidence prepared by Dr. Graf is material to Blake's claim.

### Conclusion

In his decision, the ALJ states that his RFC determination "is supported by the record, when considered as a whole, and especially in light of the minimal objective findings of record, [Blake's] generally normal clinical presentation, her noted symptom magnification, her refusal to try potentially helpful treatment modalities, and her reported 80 percent relief with white willow bark." (AR 19.) Substantial evidence supports this statement, and Blake presents no legal error requiring remand. Therefore, and for the reasons stated above, the Court DENIES Blake's motion to reverse (Doc. 10), and GRANTS the Commissioner's motion to affirm (Doc. 16). The Court also DENIES Blake's sentence six motion to remand (Doc. 19). Accordingly, the Court AFFIRMS the decision of the Commissioner.

Dated at Burlington, in the District of Vermont, this 29th day of May, 2015.

/s/ John M. Conroy
John M. Conroy
United States Magistrate Judge